1                UNITED STATES DISTRICT COURT

2                    DISTRICT OF MAINE

3    _____

4    UNITED STATES OF AMERICA,        CRIMINAL ACTION

5              Plaintiff          Docket No:  10-mj-140-MJK

6

7         -versus-

8

9    MATTHEW DEHART,

10              Defendant
     _____

11                 Transcript of Proceedings

12

13   Pursuant to notice, the above-entitled matter came on
     for **Detention Hearing** held before **THE HONORABLE**
14   **MARGARET J. KRAVCHUK,** United States Magistrate Judge,
     in the United States District Court, Bangor, Maine, on
15   the 11th day of August 2010 at 3:01 P.M. as follows:

16

17   Appearances:

18   For the Government:  Nancy Torresen, Esquire
                          Assistant United States Attorney
19
     For the Defendant:  Virginia G. Villa, Esquire
20

21             FTR Operator:  Eileen Carver

22
               Lori D. Dunbar, RMR, CRR
23              Official Court Reporter

24              (Prepared from FTR and
              computer aided transcription)
25

1                          **I N D E X**

2       **Witness**                  **Direct** **Cross** **Redirect** **Recross**

3       Amy Blanchette                 5      13        20         --

4

5

6

7

8

9

10                      **E X H I B I T S**

11      **Number**              **Description**              **Page/Admit**

12      Government's

13          1      Complaint and affidavit              25

14          2      Synopsis                             25

15          4      E-mail from Thresher                 25

16          5      Firearms permit record              25

17

18

19

20

21

22

23

24

25

1              (Open court.  Defendant present.)

2         THE COURT:  This is Docket No. 10-140, United

3    States of America versus Matthew Dehart.  The

4    Government's represented by Ms. Nancy Torresen, the

5    defendant appears with Ms. Virginia Villa, and this is

6    before the Court for hearing on issues of identity and

7    production of the warrant, a preliminary examination,

8    and a detention hearing.  Ms. Villa, are we proceeding

9    to have hearings on all of those issues?

10         MS. VILLA:  No, Your Honor, we have a waiver

11   of a Rule 5 and 5.1 hearing in which my client is

12   willing to waive the identity hearing as well as the

13   preliminary hearing but not the detention hearing.

14         THE COURT:  And you have that waiver in front

15   of you?

16         MS. VILLA:  Yes, Your Honor.

17         THE COURT:  Does he intend to execute it now?

18         MS. VILLA:  Yes, ma'am.

19         THE COURT:  All right, then he may do so.

20         MS. VILLA:  You just sign.

21         THE COURT:  And you've checked the appropriate

22   blocks indicating his waiver is limited to an identity

23   hearing and a preliminary hearing.

24         MS. VILLA:  That is correct, Your Honor.

25         THE COURT:  And he has signed it and you have

1   signed it.

2        Mr. Dehart, you understand that you're giving up

3   your right to a hearing on the question of probable

4   cause to believe this offense occurred in Tennessee and

5   that you've permitted it, and you're giving up your

6   right to a hearing on the issue of whether you are

7   indeed Matthew Dehart and there is indeed a warrant for

8   your arrest in Tennessee.

9            THE DEFENDANT:  Yes, Your Honor.

10           THE COURT:  All right.  I'll approve that

11  waiver.

12       Now, you're requesting to proceed to hearing on

13  the issue of detention; is that correct?

14           MS. VILLA:  That is correct, Your Honor.

15           THE COURT:  Okay.  Thank you, you may be

16  seated.

17       Ms. Torresen?

18           MS. TORRESEN:  Your Honor, this is a

19  presumption case because there are minor victims

20  involved, and I think that the defendant bears the

21  burden of production in this, and as I understand it

22  from talking to Virginia she's prepared to go forward

23  with that.

24           THE COURT:  All right.  The Government

25  essentially is resting on the presumption at this

1    juncture.

2         MS. TORRESEN:  Well, I'm just waiting to see

3    what she produces and then I would have more if she can

4    meet her burden.

5         MS. VILLA:  I -- I would call Amy Blanchette.

6         THE CLERK:  Please raise your right hand.  Do

7    you solemnly swear that the testimony you shall give in

8    the cause now in hearing shall be the truth, the whole

9    truth, and nothing but the truth, so help you God?

10         THE WITNESS:  I do.

11         THE CLERK:  Please have a seat.  Please state

12    your name and spell your last name.

13         THE WITNESS:  Amy Blanchette,

14    B-L-A-N-C-H-E-T-T-E.

15                    DIRECT EXAMINATION

16    BY MS. VILLA:

17    Q.   Miss Blanchette, you authored a Pretrial Services

18    report regarding Mr. Dehart; is that correct?

19    A.   Yes, I did.

20    Q.   And in that report you have recommendations about

21    the assessment of nonappearance as well as the

22    assessment of danger; is that correct?

23    A.   Yes, I do.

24    Q.   I -- in those a part of your assessment of

25    nonappearance seems to appear to be with a -- the

1  requirement of the Adam Walsh Act for electronic

2  monitoring; is that correct?

3  A.    Correct.

4  Q.    Is it correct that electronic monitoring is

5  totally unavailable in the District of -- the Southern

6  District of Indiana?

7  A.    No, it's not.

8  Q.    Okay.  What kind of electronic monitoring would

9  be available in that district?

10 A.    The RF, radio frequency unit, is.

11 Q.    And what does that radio frequency unit -- what

12 kind of information does it provide?

13 A.    That provides for when the defendant leaves the

14 house and returns to the house.

15 Q.    So that, for instance, if the defendant were

16 restricted to his parents' residence in the Southern

17 District of Indiana, except for preapproved

18 appointments or medical appointments or whatever

19 appointments that would be appropriate for him to

20 attend, as well as court hearings, that he would have

21 to contact a probation officer; is that correct?

22 A.    Correct.

23 Q.    And they would know whether or not he has left

24 and returned during the time allocated.

25 A.    Correct.

1   Q.   And that if he were to leave at any other time

2   would that show up on that monitoring?

3   A.   Yes, it would.

4   Q.   And how soon would that show up on the monitoring

5   if he left without permission?

6   A.   It takes generally up to about five minutes.

7   Q.   Now, you also mentioned a history of flight; is

8   that correct?

9   A.   Yes.

10   Q.   And that history of flight would have occurred

11   soon after a search warrant was performed at my

12   client's residence; is that correct?

13   A.   Yes.

14   Q.   What do you know about that?

15   A.   I know that the defendant apparently went to

16   Mexico shortly after the search warrant was effected at

17   the home.

18   Q.   And how did you know about that trip to Mexico?

19   A.   The defendant informed me he had been to Mexico,

20   his father informed me he had been to Mexico, the FBI

21   agents involved in the case told me he had been to

22   Mexico, and then I spoke to his father to get more

23   details about how he went to Mexico and how he returned

24   from Mexico.

25   Q.   All right.  And so his father has been very

1    straightforward about giving you accurate information

2    that later was confirmed by documents received from the

3    Government; is that an accurate or fair statement?

4    A.    Correct.

5    Q.    And it's your understanding that at the time that

6    Mr. Dehart went to Mexico he wasn't under any -- any

7    compulsion to stay in the United States?

8    A.    None that I know of.

9    Q.    And he wasn't under any compulsion to return to

10   the United States.

11   A.    None that I know of.

12   Q.    And he did return to the United States.

13   A.    Correct.

14   Q.    Regarding his residence in Canada of which you

15   also expressed a concern, how did you learn that

16   Mr. Dehart had a residence in Canada?

17   A.    He informed me he did.

18   Q.    Okay.  And did you make any efforts to confirm

19   the information that he provided to you?

20   A.    Yes, I spoke to the school.

21   Q.    And did they confirm that what he had told you

22   was in fact accurate?

23   A.    No.

24   Q.    No.

25   A.    No.

1  Q.    What was it?

2  A.    He had informed me that he was staying in the

3  lone dormitory on campus in room No. 13.  When I spoke

4  with the school they could find no record that he had

5  applied for school housing, for student housing.

6  Q.    Did you speak with his father or receive any

7  documentation from his father regarding his schooling?

8  A.    Just what you provided me, I believe.

9  Q.    Okay.  And I can't recall but did that have any

10  confirmation as to a housing unit?

11  A.    I don't know.  Some of it was hard to read

12  because it was a little blurry, to be honest.

13  Q.    Where is it?  My copies aren't the best, either.

14        While I'm looking for that document, regarding

15  Mr. Dehart's criminal history, during your interview

16  with him did he talk to you about his criminal history?

17  A.    Yes, he did.

18  Q.    And to your knowledge was he truthful about that?

19  A.    Yes, to my knowledge he was.

20  Q.    Okay.  The other part of it was a question about

21  his medical and insurance coverage and whether or not

22  he had continued on with medication while in Canada; is

23  that correct?

24  A.    Question regarding?

25  Q.    His -- he has a history of needing and taking

1   mental -- prescribed medications.

2   A.     Yes, he does.

3   Q.     Okay.  And you were unaware as to whether or not

4   he had continued that while he was in Canada; is that

5   correct?

6   A.     Correct.

7   Q.     And I provided you with an insurance coverage

8   listing, at least for the ILSC, which was a summer

9   program he attended?

10  A.     Correct.

11  Q.     That reflects that he did have insurance

12  coverage; is that right?

13  A.     Again, some of those were blurry and hard to

14  read.

15  Q.     Okay.  My copy isn't much better.  But there is

16  something from the ILSC, which was a summer program

17  separate from his current program, right?

18  A.     Correct.

19  Q.     And that confirmed that he had been in that

20  summer program.

21  A.     Correct, and I spoke to the program, too, to

22  confirm.

23  Q.     And did that program confirm that he was staying

24  with a family for purposes of that program?

25  A.     They did not confirm that one way or another.

1   Q.     Okay.  Okay.  And so your concern is is basically

2   you don't know whether or not he has been taking his

3   medications; it's just an unknown.

4   A.     That is one of the concerns, correct.

5   Q.     Okay.  Did you speak to his parents about their

6   interactions with him prior to his arrest to try and

7   confirm whether or not he had been taking his -- you

8   know, seemed to be in his normal mental state while

9   he's taking medications?

10  A.     No, I didn't.

11  Q.     However, his parents have been in regular contact

12  with him on a daily basis, just about, up until the

13  time of his arrest.

14  A.     Yes.

15  Q.     And to your knowledge you don't have any

16  information that he has a history of not taking his

17  medications as prescribed.

18  A.     Correct, I don't know that.

19  Q.     Now, you also spoke to his father about the

20  possibility of the father acting as a third-party

21  custodian; is that correct?

22  A.     Yes, I did.

23  Q.     And what was the father's response to the

24  possibility of his being a third-party custodian?

25  A.     He's willing to.

1    Q.    Finally, I wanted to ask you about a report that

2    you reference regarding a Detective Kniss, it's

3    K-N-I-S-S, I believe.  And do you have any information

4    that any of the harassment reflected in that report

5    occurred any time after January of 2009?

6    A.    No, I do not know the time frames.

7    Q.    Well, let me --

8              THE COURT:  2009?

9              MS. VILLA:  2009.

10   BY MS. VILLA:

11   Q.    Let me show you a report and see if it refreshes

12   your recollection as to when the last reported contact

13   may have been in that -- as reported by Detective

14   Kniss.  I am showing you this, directing you to that

15   date, and if you can just read that and see if it

16   refreshes your recollection.

17   A.    I actually spoke with the detective.

18   Q.    Okay.

19   A.    And during that we did not discuss time frames.

20   Q.    All right.

21   A.    So that's what I was referencing.

22   Q.    Okay.  And do you have any other information that

23   his -- the time frame reported in that report -- have

24   you been provided with a copy of this report?

25   A.    I have read the report.

1   Q.    Okay.  And that report indicates that the last

2   contact was in January of 2009?

3   A.    That's what it says, correct.

4   Q.    And you have no information from Detective Kniss

5   or otherwise that there was any contact after January

6   2009.

7   A.    No, I do not.

8   Q.    And there was no contact of any -- that you are

9   aware of after the search warrant in 2010, January.

10  A.    None that I'm aware of.

11  Q.    Okay.

12          MS. VILLA:  Thank you, I have no further

13  questions.

14                    CROSS EXAMINATION

15  BY MS. TORRESEN:

16  Q.    Ms. Blanchette, Ms. Villa asked you about the

17  defendant's use of an RF unit.

18  A.    Correct.

19  Q.    And specifically she wondered whether -- how long

20  it would take for the notification to come through if

21  he left the house without permission; is that correct?

22  A.    Correct.

23  Q.    Would the notification tell you where he was

24  headed?

25  A.    No.

1   Q.    Would you have any way by any form of GPS or

2   anything to determine that?

3   A.    No.

4   Q.    With regard to the history of flight section of

5   your report --

6           MS. TORRESEN:  And, Your Honor, we're

7   referring to this report and I would like to ensure

8   that it's into evidence in its entirety, the bail

9   report.  Do I need to move the admission of that?

10          THE COURT:  Yes, because it's not normally

11  part of the record and I don't --

12          MS. TORRESEN:  All right.  Then I would move

13  the admission of what I've marked for identification as

14  Government's 3, which is the bail --

15          MS. VILLA:  I object to it being admitted as a

16  document in evidence because it's not evidence itself.

17  The report is a confidential document that should not

18  be available to the public.  Putting it into evidence

19  would make it so.  And so it is something that is

20  available to the Court for considerations of bond, but

21  I don't believe that it otherwise needs to be part of

22  the record.

23          THE COURT:  I'll sustain the objection to the

24  report.  You can certainly put the -- any relevant

25  contents of it you can attempt to question the witness

1    about, but it would simply be shorthand to --

2            MS. TORRESEN:   Yeah, and I would hope to be

3    able to argue from it as well, Your Honor.   All right.

4    BY MS. TORRESEN:

5    Q.    Then I'd like to ask you about your history of

6    flight section on this -- in this report and

7    specifically about the trip to Mexico.   Tell us what

8    you did to verify the trip to Mexico after you had

9    heard about it from all these various sources.

10   A.    Primarily I spoke to the father to find out what

11   happened with that.

12   Q.    And I'd like to get your detail about that.   What

13   did he say?

14   A.    He indicated that after the search warrant was

15   issued, was done at the home, defendant had a problem

16   sleeping in the home, had fears that people were going

17   to kick in the doors.   He also indicated that during

18   the search warrant -- during the process of the search

19   the defendant had been placed in handcuffs and been

20   intimidated by the agents and was fearful of the

21   agents.   So he reported that his son hadn't been

22   sleeping, and he took a vehicle that belonged to the

23   family and drove to Mexico.

24   Q.    Okay.   And where did he go in Mexico?

25   A.    I believe it's Monterrey.

1    Q.    Okay.  I can hand you the report if that --

2    A.    I think I have one right there.  Yes, Monterrey.

3    Q.    All right.  And do you know where that is in

4    Mexico?

5    A.    No, I do not.

6          MS. TORRESEN:  If the judge would take

7    judicial notice, it's about equidistant to the border

8    as San Antonio is to -- you know, I didn't do the

9    mileage on it but about -- San Antonio is as

10   equidistant to the border as Monterrey is within

11   Mexico, okay?  I should have Googled it.

12         THE COURT:  You looked at the map and it

13   looked like about this much space to San Antonio north

14   and about this much space.

15         MS. TORRESEN:  Exactly, Your Honor.

16         THE COURT:  That's a scientific --

17         MS. TORRESEN:  Yeah, that tells you a lot,

18   doesn't it?

19         THE COURT:  I understand.

20         MS. TORRESEN:  All right.

21   BY MS. TORRESEN:

22   Q.   You said that he took the family car to Mexico,

23   and did he tell you anything else about how long he

24   stayed or what he did?

25   A.    He said that he stayed about two or three days.

1    He checked himself into a motel and slept.

2    Q.    And then did he tell you how he returned or why

3    he returned?

4    A.    His father indicated that the family made the

5    decision that it was important that he get back and

6    fast, that they were not worried about the car because

7    its value was very little, so they had him take a cab

8    to the border, I believe walk across the border, and

9    then take a cab on the U.S. side from the border to the

10   airport and fly back to Indiana.

11   Q.    All right.  Did that strike you as strange?

12            MS. VILLA:  Objection.

13            THE COURT:  I'll sustain the objection.

14            MS. TORRESEN:  All right.

15   BY MS. TORRESEN:

16   Q.    Did you ask the father why he didn't just drive

17   the car back to the border?

18   A.    No, I didn't.

19   Q.    Did you ask the father why he went to Mexico as

20   opposed to, say, Illinois?

21   A.    No, I didn't.

22   Q.    All right.  Did the father say why he went to

23   Mexico?

24   A.    No.

25   Q.    Did you ask whether the father knew that he was

1   heading to Mexico with the family car?

2   A.     No.

3   Q.     All right.  And then with regard to Canada, did

4   you find out when he went to Canada?

5   A.     Yes, April 24th, 2010.

6   Q.     And did you find out how he got there?

7   A.     His father communicated that they drove him

8   there, brought him there.

9   Q.     All right.  And you said that he confirmed -- you

10  confirmed that he did go to this school in Montreal to

11  learn a foreign language; is that correct?

12  A.     That's correct.

13  Q.     And he took some French courses; is that right?

14  A.     Correct.

15  Q.     And then he went to Prince Edward Island and

16  entered a welding school; is that correct?

17  A.     Correct, he's been accepted at the school.

18  Q.     Okay.  And, according to your report, the

19  defendant told you that he was living on campus; is

20  that correct?

21  A.     Correct.

22  Q.     And he was pretty clear about that, right?

23  A.     Correct.

24  Q.     But was there any contradictory evidence from the

25  father on that?

1    A.    The father indicated that when they moved him to

2    Prince Edward Island they set him up in an apartment.

3    Q.    All right.  And the school itself wouldn't

4    confirm that he was on campus; is that correct?

5    A.    Correct, the woman looked through the file and

6    determined that he had not applied for student housing.

7    Q.    All right.  With regard to the use of the father

8    as a third-party custodian, did you make any

9    investigation of the father?

10    A.    Yes, I did.

11    Q.    And could you determine anything about the

12    suitability of the father as a third-party custodian?

13    A.    Regarding -- could you be more specific?

14    Q.    Whether he'd be a suitable party to serve as a

15    third-party custodian?

16    A.    The -- the father appears to have distinct ties

17    in the community, he works there.  He does not appear

18    to have any kind of criminal record, and he appears

19    very dedicated to his son.

20    Q.    So dedicated that he gives up the family car to

21    go to Mexico -- to let the son leave the family car in

22    Mexico?

23    A.    It is possible.  He didn't seem very concerned

24    about his son's trip to Mexico.

25    Q.    All right.

1          MS. TORRESEN:  I have no further questions for

2     this witness.

3                    REDIRECT EXAMINATION

4     BY MS. VILLA:

5     Q.    I can't remember the exact words you used, but as

6     far as the father, when you say he's very supportive of

7     his son, is that in a sense of he will do what's in his

8     son's best interest?

9     A.    I believe so, yes.

10    Q.    Okay.  And in the son's best interest is, as far

11    as you know, within the legal context, what is legal?

12    A.    I don't know how he'd interpret in his son's best

13    interest.

14    Q.    Okay.  And did you ask the father whether or not

15    the family has any connections to Monterrey, Mexico?

16    A.    The father did mention that they have friends

17    down in that area.

18    Q.    Okay.  And whether or not they had previously

19    traveled to that area?

20    A.    He didn't -- I didn't ask and he didn't indicate.

21    Q.    Okay.  Other than the technicality or -- excuse

22    me, I will rephrase that question.

23          Other than exactly where the housing was

24    located, the information that he did have housing in

25    Charlottetown, I believe it's called, where the --

1    where the school is, was all correct.

2    A.     That he did have housing?

3    Q.     Is that he was going to be living -- he had that

4    place in -- oh, where is it called?  In Prince Edward

5    Island for purposes of going to school, that part was

6    correct.

7    A.     I know he was scheduled to begin school in the

8    beginning of September.

9    Q.     And that they paid the tuition and that there --

10   the parents had helped move him there?

11   A.     Correct.

12   Q.     Okay.  So that the parents confirmed that they

13   had some housing that was there in that town.

14   A.     Correct.

15          MS. VILLA:  I have no further questions, thank

16   you.

17          THE COURT:  Any other witnesses?

18          MS. VILLA:  I have some information to

19   proffer, Your Honor.

20          THE COURT:  Are you done with her?

21          MS. VILLA:  I am.

22          THE COURT:  You may step down.

23          MS. VILLA:  And the proffer is that the father

24   could not make it here in time for this hearing.  If

25   the Court cared to hear from the father personally, he

1   is willing to come and appear in court but obviously

2   could not be here for today.  That he would be willing

3   to report any violation of any bond condition to the

4   authorities immediately should his son be in violation,

5   that he would be willing to transport his son to court

6   in Tennessee as necessary and to accompany him on those

7   trips so that -- that should there be any question

8   about his whereabouts his father would be there to

9   confirm that he is -- where he should be doing what he

10   should be doing in a manner that he should be doing it.

11   I have absolutely no indication that the father would

12   do anything other than act as an adequate third-party

13   custodian.

14       And so if the Court would be willing to accept

15   that as a proffer, I make that as a proffer of the

16   Court, and that the father would be willing to drive

17   here to Bangor to pick up his son, drive him back to

18   Indiana and then to Tennessee as required, so that

19   transportation issues to and from would also be in the

20   custody of his father and that he would be more than

21   willing to sign off on the bond as being the

22   third-party custodian.

23       I'm trying to think if there's anything else that

24   I need to tell you that was not covered by Miss

25   Blanchette.  That's it, thank you.

1          MS. TORRESEN:  Your Honor, I would -- if I

2     need to go forward at this point, if she's met the

3     burden, then I would offer some evidence as well.  I

4     would offer Government Exhibit 1, which is just a copy

5     of the criminal complaint and the affidavit in support

6     of it.  Government's Exhibit 2, which is an

7     investigative synopsis done by the agent who wrote the

8     affidavit on the report, he actually pronounces his

9     name Kniss, Detective Kniss of Indiana, pardon me,

10    Tennessee, excuse me.  I would move the admission of an

11    e-mail from Loren Thresher to me which details -- Loren

12    Thresher is a special agent with Homeland Security and

13    has put together the official records of Mr. -- of the

14    defendant's entry into the United States on January

15    30th through Laredo and his entry into Calais, the port

16    of entry this most recent time.  And it also has

17    information regarding the Canadian entry in April of

18    this year when the defendant went to Canada.  And I

19    would also offer Government 5, which is a concealed

20    weapons permit for Matthew Dehart.

21         MS. VILLA:  Okay, I have an objection.

22    Government's Exhibit No. --  well, first of all, taking

23    them in order offered --

24         THE COURT:  Well, just put them here, I won't

25    look at them yet, you can put them there and I'll

1   listen to what she has to say.

2          MS. VILLA:  I believe Government's Exhibit

3   No. 1 is already part of the record because it had to

4   be part of the identity hearing.  So I -- it's

5   duplicative so I don't have any problem with that

6   coming in.

7          Government's Exhibit 2 is an investigative

8   synopsis that has an enormous amount of information in

9   it that -- some of which is speculative.  To the extent

10  that it is relevant to the issue of detention, I

11  believe that it was covered by Ms. Blanchette.

12  Otherwise I believe that it contains information that

13  is otherwise not public and should not be rendered

14  public by putting it into the -- into the record, as

15  well as the fact that I do not have the opportunity to

16  cross-examine Agent Kniss regarding the information

17  contained in that document.

18         And that, as far as Government's Exhibit No. 4, it

19  contains information regarding dates of birth and other

20  information that should have been redacted and was not,

21  and, therefore, should not be part of the public

22  record.  If it were redacted I would not have any

23  problem with it coming in.

24         And the same is true for Government's Exhibit

25  No. 5 is that I believe that there is privileged

1    information that was not redacted in that as well.  And

2    if it were redacted I would otherwise not have a

3    problem.

4              THE COURT:  I forgot, what's No. 5?

5              MS. VILLA:  It's a concealed weapons permit

6    that it -- apparently he has abided by the law in

7    obtaining a permit to carry a concealed weapon.

8              THE COURT:  What's the privilege, you mean

9    there's like a date of birth in it?  That's not

10   privileged.

11             MS. VILLA:  Privacy protected.

12             THE COURT:  Privacy protected.

13             MS. TORRESEN:  Your Honor, I'm happy to redact

14   4 and 5.  No. 2 has been fully redacted, I believe, for

15   all sorts of certainly victim identification and there

16   are some phone numbers that are left in there because

17   it's complicated and you have to match up phone numbers

18   to sort of see what's going on.  But otherwise it's

19   been redacted.

20             THE COURT:  All right.  1, 4, 5 -- what was 3?

21             MS. TORRESEN:  3 was the bail report, Your

22   Honor.

23             THE COURT:  Okay.  1, 4, and 5 are admitted

24   subject to your redacting out the date of birth.  2,

25   which is the Kniss report, is admitted over objection.

```
 1          MS. TORRESEN:  And, Your Honor, that's really
 2    the bulk of our evidence and what I would prefer to
 3    have you have a chance to look at, and then --
 4          THE COURT:  Right, I was just going to say,
 5    I'm going to take a short recess because this is fairly
 6    long.  So I'll have to look it over.  All right?  Is
 7    there anything else right now that you wish to say?
 8    All right, I'm going to take a short recess to review
 9    the exhibit.
10               (A recess was taken.)
11          THE COURT:  All right, we're resuming the
12    hearing in 10-140.  I've had an opportunity to review
13    Government's Exhibit 2 now.
14        Ms. Torresen, you wish to be heard?
15          MS. TORRESEN:  I would like to be heard, Your
16    Honor.  As we said at the outset, this is a presumption
17    charge, and the Government's position is that there are
18    no conditions which satisfy the need to protect the
19    community or assure that this defendant will not leave.
20          He's charged with enticing and persuading a minor
21    to produce child pornography, and the affidavit makes
22    clear that we're talking about two minor victims.  The
23    investigative synopsis, which I have provided as
24    Government's Exhibit 2, describes classic behavior of a
25    sexual predator.  The defendant, who I think at the
```

1   time was around 24 years old, befriends these minors,

2   one of whom is 12 at that time.  They meet at an online

3   game which has some chat feature, he befriends them

4   under a false identity.  He tells them that he's

5   Michael -- Matthew DeMarco, who's living in New York

6   City or New York, the New York area.  He's 16 years

7   old; he's the son of a mobster.  He makes himself out

8   to be something exciting.  And he contacts them via

9   this game but also it escalates to contacting them over

10  cell phones, chatting, he develops a relationship with

11  these minors and one in which they think he is

12  someone -- a teen, someone in their age group.

13       Ultimately he actually visits them in Tennessee,

14  each minor is visited individually by him.  And he

15  gives them gifts.  Some of these gifts were a watch,

16  video games, jeans, and something that he referred to

17  as uncut diamonds, which who knows what that was.

18  But in the end of December, I think it was, of 2008 he

19  actually takes one of these minors with him to a hotel

20  where he checks in and he gives the minor a beer, which

21  the minor doesn't finish, and shares Adderall with him.

22  And this was the younger one of the two minors that he

23  had at the hotel.  And at the next day, I believe it

24  was, he takes him -- this particular minor to the

25  shooting range where he brings his own firearm.  He

1    gives this minor a .380 round as a souvenir, and the

2    minor also notices that there are guns in the back of

3    his car.

4         He convinces over time these -- in befriending

5    them, gaining their loyalty, convinces them to take

6    photos of themselves, their genitalia, and to produce

7    videos of themselves engaging in some sexual acts,

8    masturbation, essentially.  And he essentially tricks

9    them into believing that they're sending it to teenage

10   girls, although the evidence suggests that they -- that

11   these girls don't exist and that the defendant himself

12   has a connection to these e-mail addresses.

13        And then apparently the parents kind of catch on

14   to this and tell them don't -- no more contact, don't

15   contact our kids anymore.  And instead of just going

16   away he sets up this elaborate ruse whereby he's using

17   spoofed telephone numbers to contact these families,

18   numerous calls, and this is what's occurring in January

19   '09, where he's pretending that he's from a law firm

20   which represents the mobster DeMarco or he's pretending

21   that he is the -- the headmaster of the school that

22   he's supposed to be attending.  And, you know, this is

23   just strange behavior, really, but reaching out to the

24   families of these boys.  And it's clear from the

25   investigative synopsis that the boys are torn.  They --

1    they have some loyalty to him and they don't want to

2    get him in trouble.  And I think that's just all part

3    of that classic preying on a young, vulnerable victim.

4        Then we come to the search warrant that's done on

5    his house in January of -- January 25th of 2010.  And

6    within days of that search warrant he's taken the

7    family car and going to Monterrey, Mexico, for rest.

8    That doesn't make any sense, that you'd go for three

9    days to sleep in Monterrey and that you'd come back and

10   leave the car there.  It just doesn't add up.  It's a

11   strange set of events.  He gets back into the U.S., and

12   then he gets enrolled in this welding program on P.E.I.

13   I can't think of a farther place to go from southern

14   Indiana to P.E.I. for welding, just seems like an odd

15   thing.  It seems like really what he wants most is he

16   knows he's in trouble and he wants to stay out of this

17   country.  When he comes into the country in July he's

18   coming in just to, what they call, do a flagpole, which

19   is come in, get your student visa updated, and walk out

20   again, go back into Canada.

21       And I know that there are some conditions where

22   you could take away a passport and try to restrict

23   travel to foreign countries.  But we all know from the

24   number of illegal alien cases that we do in Maine, you

25   can keep them from getting into the country illegally,

1   perhaps -- legally, perhaps, but it's very difficult to

2   keep someone out of another country if they're going to

3   just go again across the border at night, you know, not

4   at a port of entry.  So I think that there is a strong

5   risk of flight here.

6        The idea that the father is going to be an ideal

7   custodian seems to me completely untested at this

8   point, and we have a father who's letting the kid take

9   the family car to Mexico two days after a search

10  warrant.  I just -- seems to me like he's not at all an

11  ideal custodian.

12       In addition, we have behavior from this

13  individual, he's got some known mental issues, some

14  issues with medication, I think it's just unstable,

15  it's an unstable situation that we have on our hands.

16  And the bottom line is that the defendant is both a

17  risk of flight and a danger to the community.  And I

18  believe that it would be wise for the Court to enter

19  a -- at least a temporary order of detention to allow

20  the case to be removed to Tennessee, the District Court

21  where the charge is pending, and to allow that

22  magistrate down there to determine what's in the best

23  interest of his own community, whether this defendant

24  does present a risk to his community, whether there are

25  adequate monitoring capabilities of the probation

1    offices in those, whether the father would be an

2    adequate custodian.  I think it would be prudent to let

3    the case go down to the Middle District of Tennessee

4    for that determination and that what we should do here

5    is enter an order of temporary -- temporary order of

6    detention and then just remove it down there.

7            THE COURT:  I don't think there is any such

8    animal as you described.

9            MS. TORRESEN:  A temporary order of detention?

10           THE COURT:  Um-hum.

11           MS. TORRESEN:  Well, you've done them before.

12           THE COURT:  Well, that doesn't mean it exists.

13           MS. TORRESEN:  Well, there's precedent for

14   them.  I mean, I think what it is is --

15           THE COURT:  I mean, the law is pretty clear.

16           MS. TORRESEN:  You're going to order him

17   detained -- you've often said to people, I'm ordering

18   you detained, if you can show a change in circumstances

19   bring it back to me, I'll look at it.

20           THE COURT:  That's what the statute provides

21   for.  There has to be some -- something that's not

22   known or presented to the Court at the time of the

23   detention hearing.  The defendant has the

24   opportunity -- it's the defendant's election, he can

25   choose to have his detention hearing there, where all

1    those things you said might be better considered, or he

2    can choose to have it in the district of his arrest.

3    He's chosen to have it here.  I enter a detention

4    order, if I enter -- if I order him detained, it is a

5    detention order, and he has the same burden as I always

6    tell those people in front of me.  If there's some

7    circumstance that comes to your attention that wasn't

8    known to you at the time of the hearing, you can always

9    move to have me consider modifying my detention order.

10            MS. TORRESEN:  Well, and that's what I'm

11   proposing is that, enter an order of detention.  If he

12   can come up with some better circumstances down -- down

13   in Tennessee or in Indiana, if he can bring in his

14   custodian and if he can convince the probation officers

15   down there that, look, we've got these conditions set

16   up, then let that judge make that determination.  But

17   for today I don't believe that he's established or met

18   his burden, and I believe that there are no conditions

19   that exist that would ensure the safety of the

20   community or that would assure his appearance.

21            THE COURT:  The safety of the community

22   issues, doesn't it strike you as odd that a year goes

23   by without anything happening in this case and there's

24   no apparent danger to the community, and then the

25   search warrant's executed six, seven, eight months ago

1   now and nothing dangerous happens to the community, and

2   then on August 6th, after the defendant's apparently

3   taken into custody by immigration authorities, a

4   warrant's obtained in Tennessee?

5            MS. TORRESEN:  Your Honor --

6            THE COURT:  Apparently the defendant was even

7   taken into custody on August 5th; is that possible?

8            MS. TORRESEN:  I don't know that information.

9            THE COURT:  I read it in the *Bangor Daily*

10  *News*.

11           MS. TORRESEN:  Well, I wouldn't trust that

12  paper but -- no, just kidding.  I think it -- all I

13  know is I heard about it on Friday.

14           THE COURT:  That's when I heard about it as

15  well, late -- toward the latter part of Friday

16  afternoon, and indeed the Tennessee arrest warrant is

17  dated August 6, which was Friday.

18           MS. TORRESEN:  Right, right.  And, Your Honor,

19  I would say that the search warrant was done in

20  January, end of January.

21           THE COURT:  Right.

22           MS. TORRESEN:  And they seized a lot of

23  computer equipment which is then sent for analysis to

24  the FBI lab.  I believe it was the FBI lab.  And

25  that -- it was my understanding that that analysis is

1    just now being completed, so I haven't seen any of the

2    results of the analysis of those computers.

3              THE COURT:  Right.

4              MS. TORRESEN:  And I'm not saying that I have

5    evidence on those computers, but I suspect, they did do

6    a search warrant to find that evidence, that we'll be

7    hearing more about this.

8              THE COURT:  Right, but the salient facts in

9    the affidavit are facts that existed as of 2009,

10   essentially.

11             MS. TORRESEN:  Right, and -- -- that's

12   correct.

13             THE COURT:  With the addition of the flight

14   business after the execution of the warrant in 2010.

15             MS. TORRESEN:  That's correct, Your Honor.

16             THE COURT:  Years fly by.

17             MS. TORRESEN:  Well, the evidence of the

18   danger to the community, you know, I think the thing

19   about these cases which are sexual --

20             THE COURT:  Your burden there is clear and

21   convincing.

22             MS. TORRESEN:  That's a fairly low burden but

23   the -- what I want to say about this presumption thing

24   is that that's Congress's determination that certain

25   offenders are likely to continue to engage in criminal

1    conduct undeterred either by the pendency of charges

2    against them or the imposition of monetary bond or

3    release conditions.  And the type of offender we're

4    talking about here is this type of predatory offender.

5    That I don't have evidence that he's continued to

6    engage in it, it doesn't mean he didn't continue to

7    engage in it.  I admit that we don't have the evidence

8    for 2010, but we were focused -- the investigation was

9    focused on these two boys from Tennessee.

10            THE COURT:  So Congress went on to determine

11   that not all offenders in that category should be

12   detained because they provided for certain conditions

13   of release that could ameliorate those conditions,

14   including electronic monitoring.

15            MS. TORRESEN:  Right, but I don't believe that

16   the defendant has established any sorts of conditions

17   that would either assure his appearance or ensure the

18   safety of the community.

19            THE COURT:  Thank you.

20            MS. VILLA:  Your Honor could establish those

21   conditions by having a third-party custodian, being his

22   father, by having electronic monitoring, basically

23   having him under home confinement with the ability of

24   the probation officer to allow his release for

25   appropriate appointments that are necessary for medical

1   appointments, et cetera, that his travel is restricted

2   to Indiana and to the District of Tennessee in the

3   company of his father, which would be part of that

4   order.

5        That it would be -- let me see -- certain things

6   that Adam Walsh does include, there's been litigation

7   regarding this, and by and large what the cases that

8   have construed the Adam Walsh Act and the conditions

9   are that it's still an individualized finding.  You

10  still have to look at the individual circumstances, and

11  in these circumstances you have a person who is

12  dependent on their parents, has been, who has very

13  close ties to his parents, his parents have very close

14  ties to the community.  They aren't going anywhere,

15  that -- they aren't -- they aren't any type of people

16  who have a history of illegality.  As a matter of fact,

17  they have offered as much help and have answered

18  truthfully all of the questions put to them by the

19  probation officer for purposes of the presentence

20  investigation.  Have been forthright, as far as we

21  know, about answering questions regarding the trip to

22  Mexico, what happened to the car, you know, anything

23  that she wanted to know.  If she asked, they told her.

24  And she confirmed that what they told her was correct.

25  And so there is no -- no area to say that they would

1    not be appropriate custodians because everything we

2    know about them says that they would be, that they have

3    jobs, that they are stable.

4        Let's see.  So that's just it.  Let's see, what

5    does the Adam Walsh Act say.  Four, which is abide by

6    specified restriction on personal associations, places

7    of abode.  We don't have any problem with no contact.

8    There has not been any contact that has been put forth

9    through anything here since January of 2009, which is

10   approximately 18 months ago.  If there were any

11   retribution one would imagine it would have occurred

12   after the search warrant.  Nothing, nothing.

13       The Government says, well, it seems odd that he's

14   going to a school in Canada instead of something down

15   here in the States, except for the fact that it might

16   be a lot cheaper to go to that school, tuition could be

17   cheaper.  There are a lot of legitimate reasons why

18   somebody might enroll in that particular program than

19   otherwise.  And so for those reasons, you know, if

20   somebody said -- if the probation officer thought that

21   it was odd that they were going -- it seems like she

22   would have asked that, but apparently the conversations

23   that were being had made sense and it was just taken

24   that this is what's happening and there were legitimate

25   reasons.  They weren't trying to hide the fact that

1    that's why he was there or that was what was happening.

2         Let's see, No. 5, avoid contact, reporting on

3    regular basis, complying with the specified curfew, if

4    you had home confinement that -- the specified curfew,

5    I guess, would substitute for home confinement or that

6    is what it is.  And that's just an interesting thing is

7    even the Adam Walsh Act does not necessarily foresee

8    strict home confinement.  I'm just saying is that he

9    right now does not have a job to go to and so does not

10   need to have those regular release hours.  But even in

11   this type of case in general Congress has not said if

12   they are released to the community they have to be

13   under home confinement.  That's not the idea of what

14   those restrictions are.  And so I don't think that

15   that's what the presumption means or indicates at all.

16        As far as the possession of firearms and his

17   concealed carry permit, that just indicates that he

18   actually was following the law in order to engage in

19   certain conduct.  It does not indicate that he would

20   violate an order that would prohibit him from having

21   any firearms at all.

22        And so all of those parts, I mean, if the Court

23   wanted to have him have no computer contact, his

24   parents have indicated, as reflected in the bail

25   report, they're willing to purge their house of those

1    computers and to disallow that type of contact.  So

2    that whatever is the concern that is evident in these

3    particular -- this particular case, there appears to be

4    a condition that the Court would be able to structure

5    to account for that concern.  And when there are those

6    conditions, that can be structured, that's when the

7    statute says the Court should impose them and order

8    release.  And that is because it is still part of our

9    Constitution that a person is presumed innocent until

10   and unless convicted and that a person should not be

11   detained unless there are compelling reasons to do so.

12   And I believe that there are not those compelling

13   reasons in this case.

14        THE COURT:  Thank you.  Ms. Villa, I think the

15   problem with this case is -- that you haven't accounted

16   for and that Ms. Torresen characterized as the

17   weirdness factor is the really disturbing part.  I

18   mean, fleeing to Mexico after a search warrant is

19   disturbing.  I could infer from what I heard that it

20   was disturbing to Mr. Dehart's father and he wanted him

21   back and he wanted him back now because he knew that

22   that wasn't going to get him anywhere in the long run

23   and could be dangerous to him.  But the fact is he fled

24   to Mexico.

25        And then going to school to Canada, it may be

1    cheaper, you say.  There's no evidence -- no suggestion

2    that it, A, is cheaper.  One knows if one is a resident

3    of Canada on a seasonal basis that dollar change is at

4    par right about now so there's not a lot of benefit to

5    Canadian living in terms of economic advantage.  And

6    that's -- that's strange to go to school in Canada from

7    southern Indiana.  It's unexplained on this record

8    except to get away, and that's in the face of the

9    police coming and being intimidating in executing a

10   search warrant.

11       Obtaining an arrest warrant and charging someone

12   with an offense that carries a 15-year mandatory

13   minimum is much more intimidating in my view, thereby

14   escalating by extreme measures the risk of flight.  And

15   I view this entirely as a risk of flight case based on

16   the unique circumstances of this case.  I do agree with

17   you, Ms. Villa, that the dangerousness components could

18   be ameliorated by an Adam Walsh sort of release, and I

19   think the Government, you know, has, for whatever

20   reason, because of its thorough investigation, has sat

21   on the case for almost two years and there's been no

22   indication of harassment of victims or further

23   dangerousness.

24       But what that little harassment of the victims'

25   family interlude tells me supports my concern about the

 1   risk of flight because it shows the degree of the

 2   defendant's sophistication with identity things and

 3   spoofing calls and handling how to get around in the

 4   world.  He's not naive in terms of how to disguise

 5   himself or disguise his identity.  And that creates a

 6   concern for me that feeds into my concern about the

 7   risk of flight.  So I view that whole bit with the

 8   victims' family and the post learning that they had

 9   initiated some sort of investigation not so much as

10   clear and convincing evidence of dangerousness but good

11   evidence that increases the risk of flight in this case

12   because of the sophistication evidenced by that.

13          So for all those reasons, I think that in this

14   case I have to enter an order of detention, given the

15   seriousness of the offense, the history of prior

16   conduct since it became known to the defendant that he

17   was under investigation, first with the families, then

18   fleeing to Mexico, then establishing himself in Canada,

19   all of which suggest to me that he wants to avoid at

20   every cost prosecution.  And now he's confronted with

21   the reality of prosecution for a most serious offense.

22   So I think all of that risk is magnified 50 times over

23   with the return of a complaint and search -- and arrest

24   warrant on his behalf.

25          MS. VILLA:  May I address the Court's

1    concerns?

2          THE COURT:  I've ruled, Ms. Villa.  You had

3    your opportunity to address the Court's concern; that's

4    why we had a hearing.

5          MS. VILLA:  Yes, except for the fact that I

6    think that there are certain reasons why the Court has

7    concerns about the risk of flight that may be not

8    supported by what the record is, and this is just it --

9          THE COURT:  Well, you know, you can take that

10   up in your appeal, which will go to the United States

11   District Court in the Middle District of Tennessee.

12         MS. VILLA:  Thank you.

13         THE COURT:  Okay.

14              (Time noted:  4:18 P.M.)

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T I O N**

2    I, Lori D. Dunbar, Registered Merit Reporter, Certified

3    Realtime Reporter, and Official Court Reporter for the

4    United States District Court, District of Maine,

5    certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.

7    Dated:   September 28, 2010

8                    /s/ Lori D. Dunbar

9                    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25